which is 25-1752, Huey v. Anavex. Council Apton, you've reserved two minutes for rebuttal. Make sure Judge Calabresi can hear okay. Whenever you're ready, Mr. Apton, you may proceed. Good morning. May it please the court. I am Adam Apton. I represent the plaintiff appellant in this class action lawsuit that alleges claims under Section 10b of the Exchange Act and SEC Rule 10b-5. The reason we are here today is to discuss loss causation and whether my allegations were sufficiently pleaded under the Loralee case from this court. I submit that they were. There were two corrective disclosures in this case, both linked to one another. The underlying theory of loss here was that the defendants, the appellees, concealed the weakness of their clinical trial data by using a specific type of analysis as opposed to the one that the FDA told them that they should use. Halfway through the class period on February 7th, 2023, they claimed that they would not be using their preferred, the defendant's preferred analysis, but said nothing of the weakness of the data. It was not until January 2nd, 2024, that that truth finally emerged. Well, I thought that February 7th was the date on which they clarified that what they had said on February 2nd was incorrect. I thought that from your pleading, your claim is that something happened and that there was enough shown to be loss causation as of February 7th. Am I incorrect? That is true, Your Honor. There was. The district court said that the disclosure on that day did not translate to loss, which I will address. But my point here is that the disclosure on February 7th that Your Honor points out was causally linked to the subsequent disclosure on January 2nd. The district court made two errors which should respectfully lead to a reversal. The first was disregarding the allegations for February 7th, and the second was similarly disregarding the allegations for January 2nd. With respect to February 7th, the district court did not consider the declines that occur following the corrective disclosure on February 7th. There was a temporary increase on. Yeah. So here is the question for me. I don't agree that it is automatic that if the price of a stock goes up on the day there is disclosure that there is no loss causation because if the price goes up by .001, but the market goes up by 1,000, there can be just as much as if a price had gone down. But my question is, have you pled anything given the fact that the market did go up on that day and then changed mildly that would be enough to suggest loss causation? Respectfully, Your Honor, I would say that I did. Under Iqbal and, you know, under the requirements that there are for making a plausible claim. Yes, Your Honor. Paragraphs 115 and 116 in the complaint, which appear in the appendix at pages 59 and 60, do specify the decline and link that decline to the truth that was disclosed partially on that day. My question is, how much must one plead specifically in a situation where on that day the price goes up? Let me give you just a stupid example. I am speeding. A tree falls on me because I'm speeding. No causal link, no loss causation, okay? I say at the same time, but the vibrations from speeding do cause trees to fall more often. Is that enough or must I also plead something more specific? When I'm the face of it, it looks as though there wouldn't. You know, that's for me the question. How much in these cases where, you know, a connection is plausible, but there's something that suggests it didn't happen, how much must you plead more? To borrow Your Honor's analogy, I would say one needs to plead that there was at least a representation of a well-built house. It need not be earthquake-proof. I'm referring to the Lorelei decision, but this is certainly more what we have in this case, more than Lincoln's house. We have a underlying theory here that the defendants concealed the weakness of clinical data by using this RSBQ AUC analysis. They then said they were not going to be using it, while at the same time, not saying anything about the weakness of the data itself or what it might do to strengthen the data under the proper analysis. I have a related but slightly different focus. It seems to me even if we accept that there should not be a per se rule, and even if you've sort of done enough with respect to other, for pleading stage, other factors in what might cause up or down, the whole idea of the market is that it's premised on the absorption of information. And what allegations would I look to that would explain why this pre-opening, fairly simple, straightforward, not buried in pages and pages and pages of other documents that just explains the change from what the market might have understood on February 2nd to what the market did understand on February 7th. Why there wouldn't have been a drop that day rather than a rise. Seems to me even if you reject any kind of per se rule, there have to be sufficient allegations to explain that. So what allegations do I look to that help me explain that? Sure. Your Honor, the nature of the information released on February 7th was on its surface level, simple enough. We're not using RRSP. Yeah. A lot of these cases it takes me a long time to figure out what's going on. This one not so long. But, Your Honor, the ramifications of that decision were not well understood, certainly not within that trading day. It took a few hours for the market, for sophisticated market participants to understand exactly what that meant for the avatar case. What allegations tell me, what specific paragraphs in the complaint make those allegations? Your Honor, I would refer the Court to paragraphs 7 and 8 on appendix page 12 and then 115 and 116. I'm not clear that there is a link to what was going on here and why the market would not respond more quickly. Again, starting out with a notion that it's not a per se rule, but that where that happens, it is to be expected that there is no causal link or lost causation or whatever one wants to call it, and that then you have to plead something which is plausible under Iqbal in those cases that says, but here there was a delay. And that's what I got to go back and see, but I'm a bit troubled about that. I appreciate that, Your Honor. I think that had the company said on February 7th, we're going to have to use RSBQCGI, which holds us to a higher standard, then we wouldn't be here. Well, but the problem is if you have then given something which is technically correct, why isn't that enough? You're saying they could have said something more, of course. They could have said the company is going gluing. But if what they said was then correct and cured the error, which is the claim, then why isn't that correctness enough? And the question being, has the market understood it? Well, Your Honor, I would refer to the Abramson case, Abramson v. Newlink Genetics. That was a situation, and there was a similar company, Biopharmaceutical. There was an initial partial corrective disclosure that was ruled non-actionable. But the second, the latter corrective disclosure, was what did the trick at the pleading stage. So just give me the numbers. The paragraphs that I should look to in the complaint that make the allegations as to why the market didn't absorb this information. Yes, Your Honor. It would be paragraphs 7 and 8, and then 115 to 116. OK. The problem is that markets fluctuate. And it's perfectly possible that on February 7, when the first disclosure was made, it's very technical, maybe it takes a while to absorb. I hear your argument. The problem is, what are the limits to it? Because when a disclosure happens simultaneously with a rise, and it's supposed to be adverse, and then it goes down later, what you're looking at is something that's going to go up and down all along. And so what is the limiting principle? I hear the requests to elicit information on what would happen that would offset the negative impact of the disclosure made on February 7. But more generally speaking, what's the principle we look to to decide, within a fluctuating market, what is indicative of loss causation? I think it would be plausibility, Your Honor. And we have here a situation where it was not days, or weeks, or months for that temporal gap. It was a matter of hours, as Your Honor suggested. But it is also the case that the changes in the next few days were not at all dramatic. Had they happened immediately, that might be enough for loss causation. But what is there about this that suggests, oh, there was a delay of one day, and then, and so on? That's what's hard to say. Now, I have one other question, which will be addressed, maybe, primarily to the other. You asked for amendment, and amendment was denied to amend your complaint. But you didn't propose anything in the amendment that would go to these questions which we are asking. And the notion that an amendment would be futile, when what we're saying is there might be some things which you could have given. But you didn't suggest any of the things, did you? Well, Your Honor, I would say that under the Lorelay decision, if there's an opportunity to amend, to include facts, to explain. Well, what would you include? What can you, here, now, represent to this court? Are allegations, in good faith, that you could make that would help establish plausibility as to why the market couldn't absorb this information in a full day of trading? Well, I think additional details of the complexity of the information given on February 7th, combined with analysis of the complexity of the information. Well, the simple claim that they were not going to be using RSBQAUC, and then what that meant for the hurdles for the data going forward in the RSBQCDI. I think that's pretty well planned. I thought so, as well, Your Honor. Maybe the pushback to what you're saying, that occurs to me, is that the audience for this stuff is pretty narrow. This is not people who look at the news to check the scores or read the funnies. These are people who are in these hedge funds that are looking at pharmaceuticals. They're among the most sophisticated people on Earth in this area. I could easily conceive of offsetting events that would cause a stock to rise on bad news if there was an environment that was sharply affirmative. And I would say, Your Honor, that there was a large retail investor base in this stock. And there was other positive information given on February 7th, as well. So if, Your Honor, as you were asking, if there was additional information to be given, it would be going over what positive information was given alongside that disclosure about not using the AUC methodology. Thank you. Thank you. I'm over time. Thank you. You do have two minutes for rebuttal. We'll hear from counsel Topetsis. You tell me how to pronounce your name, please. You've got it right. Thank you, Your Honor. Broken clock. May it please the court, Steve Topetsis on behalf of the defendants, Applees, Anovex Life Sciences Corp, and Christopher Missling. The district court properly determined that the plaintiff had failed to plead adequately lost cause of injury. Yeah, but the district court went strictly on the ground that the market went up that day. And that's clearly wrong. I mean, the market can go up, and there can be lost causation if that day the rest of the market goes up by 1,000 points, and the stock here goes up by 0.01. Your Honor, we view the matter as very straightforward. In this case, it goes to some of the comments from Judge Nathan. These cases are viewed on their facts. There is some variability in the cases, although the weight of the case law in this circuit and elsewhere provides that a single trading day is determinative. Are you advocating for a per se rule? Not, Your Honor. We don't think it's necessary for the court to reach it. We do think that the facts in this case are so straightforward. February 2nd, a press release which states, in communicating with the FDA, we received their input on the endpoints which were utilized in the study. February 7th, five calendar days later, three trading days later, it was an intervening Saturday and Sunday, February 4th and 5th. Curative disclosure, corrective disclosure that says we're using different endpoints. We're going to use RSVQ and CGII as co-primary endpoints. Very straightforward. The plaintiff in this case seeks the benefit of the efficient market hypothesis and presumption of reliance. I'll cite the court to the appendix submitted by the plaintiff, pages 61 and 62. But counsel, when you have corrective information, bad news, and the price promptly goes down, we do apply a per se rule, don't we? We don't look to say, well, maybe the overall market was going down, so we should disregard that. There's a per se rule which is analogous to the rule that we're discussing today. I don't know why one is per se and the other isn't. Well, it is true that most of the cases find on stock drop cases, it's more stark. This case, given the character of the alleged false statement and the curative disclosure, it's very straightforward. Again, words of one syllable, as the court said. But isn't the per se rule wrong the other way? The stock goes down by 0.01. The market collapses that day. I think most of us would say it's like a badly built house where all the houses in the area are blown down by a hurricane, not lost causation. But the presumption is strongly that way. Then the question is not of the ultimate facts, but what is enough to plead? And so the question is, have they led enough here on these circumstances? We submit no. There's heightened pleading requirements under the PSLRA and pursuant to 9b of the federal rules. In this case, they plead the efficient market. They cite the fact that the stock is traded on NASDAQ, which is automated and highly efficient. They cite the fact that- Sorry, heightened pleading standards on loss causation under 9b? You have to plead that the subject of the false statement caused the loss. I'm just asking, is it under 9b in your understanding for loss causation, not talking about falsity or materiality? I think it is under 9b. They have to, some courts have talked about in terms of the loss touching upon the false statement more commonly and more recently. I think we had a recent decision to the contrary that is post the briefing in this case. You wouldn't deny that for an investor in your client, it would matter a lot whether the AUC or the CGI standard is going to apply because only one deals with an improvement at the end of the period, which is really all anybody you'd think would be interested. I don't want to take a pill where I'm going to get better on Tuesday and they're going to get worse on Friday. It may or may not, Your Honor. The analysts who cover the company did not write about this change, which was announced very starkly, again, words of one syllable on that February 7 earnings call. This was a prominent disclosure. This was not an obscure media outlet. This was the earnings call. Let me ask a different question. The district court said any amendment would be futile and they didn't present anything which would change what we are now saying. Shouldn't they be given a chance, given what we're saying, to come in and say, but there were special reasons why this market would not respond, despite the fact that these are experts or so on? Or does the fact that they didn't and haven't here today be enough to say, no, they didn't do it? I submit the fact that they didn't and the fact that they didn't articulate anything today is enough. But I would further say this. The district court found that nine of the 10 alleged misstatements were either literally true or inactionable. Huffery, fraud by hindsight, forward looking statements. That is another argument, but that's not really. We're focusing on loss causation. But as to loss causation, the finding of the court below is really consistent with the weight of the authority. They're citing Morlai and some of these other cases, but they're not factually analogous. They've cherry picked some non-binding out of circuit cases that talk about more complex circumstances. Again, this is straightforward. We're changing the endpoints. Where plaintiff really strains, and this is where I think they fall down in terms of articulating with particularity a basis for the claims and loss causation is, they're trying to build a bridge between this corrective disclosure and test results. These are multi-center, double-blinded studies that are not unblinded until about 11 months later. The notion that people knew, and this in part goes- I take it what you're saying is that whatever the falsity, assuming it was false, you're denying it, that that falsity, when it was corrected, did not have any effect on the market. That what had an effect on the market were other things which were- Yes, Judge. I'm sorry. The study results disappointed. And so what the plaintiffs are doing here, my friend is opportunistic and clever, he's trying to build a bridge between this modest corrective disclosure, which was very straightforward and was readily absorbed by the market, and test results that were announced 11 months later and that disappointed. And that may or may not have had to do with the endpoint. But they haven't articulated enough of that linkage to satisfy the pleading requirements. The price the day before was 11 and a quarter. Three days afterward, it was down almost a dollar. That's a lot. What if a plaintiff can show that there was a delay in the market absorbing that information, but that when it did, the price was discounted, going forward for an appreciable period of time? I can't discount the possibility of that, Judge, in another case, on other facts, or some cases- Well, but remember, we're at the pleading stage, and that's the problem. And essentially, what Judge Jacobs is saying, suppose that had happened on February 7th, that it had gone down, the 5% it went on the next, and the 5% it went on the other, and the market, which didn't. Wouldn't that clearly be enough to plead loss causation? So isn't there enough even here to do that? I submit no, Your Honor. Again, there's no linkage between the falsity and the loss. There is no loss here. The stock did go up. This is not a more complicated circumstance involving other factors. This is very straightforward. They're focusing on conjecture. You are saying that there is nothing pled here that suggests that we should look to two days hence, rather than that day? Correct, correct. And so that's what we gotta look to, whether there is enough pleading, or could be enough pleading, to show why that delay. I agree with that, Judge. If the loss that happened on February 8th or February 9th happened February 7th, would you concede that loss causation's been adequately pled? No, we'd have to look at the allegations, Your Honor. Not in a vacuum. They had abundant opportunity here to mine February 8th, to mine February 9th, to review the analyst reports. There's a lot of data of which the court properly took judicial notice at the initial pleading stages, the court below. And the plaintiffs couldn't tease out anything to put some more meat on the bones. It is conjecture. But so you're not, it answers surprisingly, because then that's not an argument about the price going up, sorry, about the price going up. That's an argument about other failures of pleading, which I'm not sure that's consistent with our cases on pleading. What assumptions follow from significant price drops immediately? I understand the observation, Your Honor, and I'm not discounting that it would be enough. I just would have to see it in context. That's my only reservation on it. You're quite right in saying, and we cite the cases, they've cited some. Where there is a stock drop on that day, it tends to satisfy loss causation. That's why the district court noted properly that loss causation is easy to plead, but difficult to prove. Stock drop cases, we announce we missed earnings, our IP is defective. Yeah, but my question is a pleading question. If the price drops that happen on the 8th or the 9th happen the day of, if that's the pleading, is that sufficient for loss causation? If it was packaged in allegations, sufficiently particularized allegations. No, we have said that we don't need to be that particularized in these cases. There's a difference between a misstatement, which is this house was owned by Judge Jacobs, and therefore I bought it, and it wasn't owned by Judge Jacobs, and if it hadn't, I would have bought another house, and there's a hurricane and so on, in which there is no connection at all. And these cases, which are cases which say there was something wrong with how the house was built, and then there was a hurricane, so it's plausible that the house being built badly was not. And then the question is how much that is, and we have tended to say in a market situation that where the market goes down, plausibly this is enough at the pleading stage. The question is when it doesn't, what is enough at the pleading stage? I understood, Your Honor. If they had said, and if the market had gone down on the 7th, if they had said the market reacted to the CGII announcement, the change in endpoints, and drop, and they had pled that linkage, then that may very well be enough. I just would have to see it in context in responding to your hypothetical. As I understand, Your Honor. There's so much variability, sorry, Judge. I don't know whether it's central to your argument, but you really have been deprecating the difference between these two standards for judging the efficacy of a drop, but it sounds to me like the difference between chances of prevailing on appeal, if the standard is arbitrary and capricious, or if the standard is clear error. It affects the likelihood of success. Why isn't this distinction, just forget about what happened with the market, why isn't this distinction objectively really important? I don't think it was to the market, Judge. I don't think, if you look at the analyst commentary which was presented to the district court below, if you look at press reporting, if you look at other things, what was significant to the market was the actual results which weren't known until 11 months later. And then the stock dropped. And then the stock dropped. Okay. Thank you. Thank you, counsel. And we have rebuttal for two minutes. Counsel Afton. Thank you, Your Honor, Judge Nathan. You asked me for paragraph sites as to what information would be in addition. I buried the lead. Paragraphs 97, 98, and 99, Your Honor, feature the February 7th earnings call excerpts of it in which I highlight in the complaint, paragraph 97, specific portions that made it seem like this difference between the two studies was not material. And where Defendant Misling at the end says, it doesn't matter even if we do change the analysis because the study is large enough that it can carry the signal by itself, meaning that it was properly powered. This is complex stuff. And so this is- I mean, you pointed me originally to 115 and I thought that actually cut in exactly the opposite direction. It says, on February 7th, Defendants revealed to investors and analysts that they would not be using AUC endpoint in the excellence trial pursuant to FDA guidance. And I'm quoting you. Thereby indicating that the avatar trial results were potentially not as positive or supportive as initially represented. Yes, but we're looking to see why there was a delay of five, seven hours in terms of the drop. And this is it. It's what Defendant Misling said during that conference call that obscured the impact. What time of day was the conference call? I believe it was pre-market.  Your Honor, yes. Pre-market. About 8.30 a.m. So at that point, they said something. What we said in the second was wrong. Now, why wouldn't you expect? Or what have you pled that would lead us to believe that those people who are interested in this kind of stock would not have reacted immediately. Or immediately, you know, within that market day. A, Your Honor, this is complex material. It's going to be deciphered. Well, of course, but these are complex investors. I mean, you know. And number two, or B, Your Honor, it's the other statements Mr. Misling said both before and after this revelation, which was that he says at the top of page 43, paragraph 97, appendix 51. Well, but if they made other statements which are not incorrect, which are not frauds, then it doesn't matter. They have said it right. And the question is, when they have said it right, did the market react? I mean, they could have said on point A, we said in February 2nd, we said white. On point B, February 7th, we said blue. White would be, in fact, glorious blue, terrible. And then they spent the rest of the day saying, but we're wonderfully optimistic. We're doing great things and so on. So what? Your Honor, I would refer to the Virginia Bank shares case because the statements that Defendant Misling said on February 7th did not reduce the risk of misleading to nil. It obscured the impact of this change in primary endpoint. And that's why it took until January 2nd for the market to finally say, oh, well, what do we now see? Okay. Thank you. Thank you. All right. Thank you, counsel. We'll argue, we'll take the matter under submission and turn to our next case to be argued, 25-210, United States versus Ross. Thank you. Thanks, Mark. Thank you. And counsel Johnson, you've reserved three minutes for rebuttal. Whenever you're ready, you may proceed. Thank you. And may it please the court, my name's Barclay Johnson. I'm pleased to be here on behalf of Grace Ross. Vermont's domestic assault statute is an alternatively phrased statute that is not divisible and that does not qualify as a misdemeanor crime of domestic violence because it is overbroad and includes attempts recklessly causing bodily injury without physical contact and includes threats of serious bodily injury without any requirement that the threat involve a deadly weapon. So counsel, you say these are different means of establishing a common element, right? Yes. What's the element? The element that we deal with most is intent. So that's mens rea. So you don't think this crime, so they're all means of establishing intent? Recklessness is a means of establishing intentionality? Yes, it's a less culpable means and in this decision, Fonseca versus Citron. Well, before we get to that, because that's obviously important to get to, but I just want to make sure I understand in your textual reading. So you don't think attempt, so recklessly causing bodily injury to a family or household member? Yes. Does that, is the mens rea of that intentionality? It is recklessness. So we have the attempt, which involves a specific intent to commit the crime, willfulness, and then recklessness, which would be- Doesn't require, it's recklessness. It's not intentional. It's a lesser mens rea. And hasn't the Supreme Court said that reckless is sufficient as for intent to be violent? Hasn't that issue of the Supreme Court, I think it was in Voisin or something, settled that issue? Yeah, with respect to statutes that in fact require contact, a physical touching, after Castleman and Voisin, indeed in Voisin, the Supreme Court said that somebody who acts recklessly uses force, but if you look at the statutes involved in that case ending Castleman, the main statute in Voisin required touching. It involved a provision that criminalized intentionally, knowingly, or recklessly causing bodily injury or offensive physical contact, while the Tennessee statute in Castleman was even more clear and involved intentionally or knowingly causing.